# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2184

_____

United States of America,

Plaintiff - Appellee,

v.

Brian Vickers,

Defendant - Appellant.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the
\* District of Nebraska.
\*
\*
\*

_____

Submitted: December 10, 2007
Filed: June 20, 2008

_____

Before LOKEN, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.

_____

LOKEN, Chief Judge.

Brian Vickers appeals his conviction and sentence for four counts of knowing possession and interstate transportation of stolen property in violation of 18 U.S.C. §§ 2314 and 2315, and for conspiracy to possess and transport stolen items across state lines. Vickers contends that the evidence was insufficient and that the district court[1] erred in imposing two-level sentencing enhancements for being in the business of receiving and selling stolen property and for obstruction of justice. We affirm.

---

[1]THE HONORABLE JOSEPH F. BATAILLON, United States District Judge for the District of Nebraska.

# I. Sufficiency of the Evidence

At trial, the government's first witness was Investigator Eugene True of the Nebraska State Patrol's auto fraud division, who described his investigation. Zach Bryant, Vickers's friend and former coworker, told a Nebraska state patrolman that Vickers was dealing in stolen tractors and trailers. True visited Vickers's residence in Elmwood, Nebraska, to engage in a "knock and talk" interview. Vickers's mother, who lived with her son, gave True permission to search the premises. After determining that thirteen other tractors were not stolen, True examined a Talbert flatbed trailer that Bryant had reported as possibly stolen. True observed that the vehicle identification number ("VIN") plate was attached with barn screws, suggesting the original VIN plate had been removed, and he found grind marks on the underside of the trailer where the secondary VIN number should have been located.

Contacted by phone, Vickers explained that he had purchased the trailer from Bryant for $7,500 and obtained a replacement VIN plate from its manufacturer. At the Department of Motor Vehicles, True learned that Vickers misidentified the model year and submitted a bill of sale stating that Bryant had traded the trailer to Vickers in exchange for a John Deere tractor. Confronted with the bill of sale, Bryant denied ever owning the trailer and said his signature on the bill of sale was forged. True fitted Bryant with a wireless transmitting device, and Bryant met Vickers at a Wendy's restaurant. Vickers made incriminating statements, instructed Bryant to "stick with the story" that he had sold Vickers the trailer, and offered Bryant a John Deere tractor or "a couple thousand bucks" for his trouble. The tape of this conversation was played for the jury later in the trial. True located the owner of the Talbert trailer in south central Illinois, where it had been reported stolen.

After Vickers was arrested on Nebraska state charges, True continued his investigation. In an interview with Jeremy Bailiff, a Vickers acquaintance, True learned that Bailiff had obtained a riding lawn mower and an all-terrain vehicle ("ATV") from Vickers. True determined from a law enforcement database that both

were stolen in south central Illinois. During another interview, neighbor Marion Wenzel informed True that Wenzel had obtained a John Deere skid loader and a John Deere lawn mower from Vickers. True inspected this equipment. The primary product identification number ("PIN") on the skid loader was missing, but he found a concealed secondary PIN. The PIN on the lawn mower was scratched beyond recognition. A database analysis revealed that all five pieces of equipment -- trailer, skid loader, two lawn mowers, and the ATV -- were reported stolen within a thirty-mile radius in south central Illinois. Vickers's ex-girlfriend, Jennifer Henson, told True that she had traveled with Vickers to Kinmundy, Illinois, to pick up a trailer from Rodney Armstrong, a business partner. Henson's description of the trailer matched the stolen Talbert trailer True found on Vickers's property. Henson said that when she confronted Vickers with her suspicion that the trailer was stolen, he said she "would go down with him" if she told the authorities.

Testimony by Bryant, Bailiff, Wenzel, and Henson supported True's testimony, and the government presented additional evidence that Vickers had possessed and transported stolen equipment. In his defense, Vickers testified he had no knowledge any of the property was stolen and reasonably relied on assurances by his long-time business partner Armstrong that the property was not illegally obtained. He claimed that most of the government witnesses lied at trial. The jury convicted Vickers on the five counts charged: knowingly transporting, receiving, and possessing the stolen Talbert trailer and the stolen John Deere skid loader, and conspiring to transport, receive, and possess stolen goods in interstate commerce.

In challenging the sufficiency of the evidence, Vickers contends that the jury did not adequately evaluate the credibility of the trial witnesses. He notes that Henson and Bailiff admitted lying to True during the investigation. Henson initially implicated Vickers, then recanted during an interview with True and an Assistant United States Attorney, and then again implicated Vickers when True threatened her with state charges. Bailiff initially lied about possessing the stolen ATV and where he had obtained it, then avoided federal and state charges by agreeing to testify against

Vickers. Vickers suggests that Bryant suffered from lapses of memory and that a careful parsing of the tape of his conversation with Bryant at the Wendy's restaurant demonstrates that seemingly incriminating statements were in fact consistent with his claim of innocence.

In considering sufficiency, we review the evidence in the light most favorable to the jury's verdict, giving the government the benefit of all reasonable inferences and upholding the conviction unless no reasonable jury could have found the defendant guilty. United States v. Marquez, 462 F.3d 826, 828 (8th Cir. 2006) (quotations omitted). As credibility determinations are for the jury, they are "virtually unassailable on appeal." United States v. Alama, 486 F.3d 1062, 1065 (8th Cir. 2007). On numerous occasions we have upheld jury verdicts based solely on the testimony of cooperating witnesses. See, e.g., United States v. Velazquez, 410 F.3d 1011, 1015-16 (8th Cir.), cert. denied, 546 U.S. 971 (2005). Here, the government also presented substantial physical and documentary evidence linking Vickers to the transportation and possession of stolen equipment. The evidence was more than sufficient for a reasonable jury to convict Vickers of all five charges.

## II. Sentencing Issues

On appeal, Vickers argues that the district court committed two errors in determining his advisory guidelines sentencing range. Under the current advisory guidelines regime, the district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," because that determination provides an "initial benchmark" that helps "secure nationwide consistency." Gall v. United States, 128 S. Ct. 586, 596 (2007). On appeal, our first task is to "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range." Id. at 597. A non-harmless error in calculating the guidelines range requires a remand for resentencing. United States v. Weems, 517 F.3d 1027, 1030 (8th Cir. 2008). Absent reversible procedural error,

we then review the reasonableness of the court's sentence for abuse of discretion. Gall, 128 S. Ct. at 597. Here, after determining the advisory guidelines range, the district court imposed a sentence of twenty-one months in prison, the bottom of that range. Vickers does not raise a separate reasonableness issue.

1. Vickers first argues that the district court erred in determining he was "a person in the business of receiving and selling stolen property" and imposing the two-level enhancement in U.S.S.G. § 2B1.1(b)(4). After the Guidelines became advisory in United States v. Booker, 543 U.S. 220 (2005), we concluded that Booker did not change our procedure for reviewing challenges to the district court's interpretation and application of the Guidelines. Though the Supreme Court in Gall described this as part of our review for "significant procedural error," we find nothing in Gall requiring a change in our manner of review. Therefore, we continue to review the court's factual findings for clear error and its interpretation of the Guidelines *de novo*. United States v. Mashek, 406 F.3d 1012, 1016-17 (8th Cir. 2005). Here, Vickers concedes (perhaps ill-advisedly) that we review the district court's finding that he was in the business of receiving and selling stolen property for clear error.

For many years, several of our sister circuits debated which of two tests to apply in defining the "business of receiving and selling stolen property" for purposes of this enhancement, a debate our court managed to avoid. See United States v. Maung, 267 F.3d 1113, 1117-19 (11th Cir. 2001) (collecting cases); United States v. Collins, 104 F.3d 143, 144 (8th Cir. 1997). In a Guidelines amendment effective November 1, 2001, the Sentencing Commission resolved this conflict by adopting application note 5 to U.S.S.G. § 2B1.1, which provides:

> For purposes of subsection (b)(4), the court shall consider the following non-exhaustive list of factors in determining whether the defendant was in the business of receiving and selling stolen property:
>
> (A) The regularity and sophistication of the defendant's activities.

(B) The value and size of the inventory of stolen property maintained by the defendant.

(C) The extent to which the defendant's activities encouraged or facilitated other crimes.

(D) The defendant's past activities involving stolen property.

As § 2B1.1(b)(4) applies to a wide variety of criminal offenses, these mandatory factors may seem unrelated to (or even inconsistent with) the plain meaning of the word "business" in a particular case. But the Commission helpfully explained that it intended in note 5 to adopt the "totality of the circumstances approach" in United States v. St. Cyr, 977 F.2d 698, 702-04 (1st Cir. 1992). See U.S.S.G. App. C - Vol. II, Amend. 617 at pp. 177-78. Depending on the circumstances, the court's discussion in St. Cyr may prove more instructive than the text of note 5.

In overruling Vickers's objection to this enhancement, the district court carefully considered each of the factors listed in note 5 and found that Vickers had regularly and over a considerable period of time received and resold substantial items of equipment that were stolen by Armstrong and his confederates operating a relatively sophisticated interstate theft scheme, thereby encouraging these crimes. After reviewing the trial and sentencing record, we conclude that these findings are not clearly erroneous. Vickers argues that he did not maintain an "inventory" because he never possessed more than one or two pieces of stolen equipment at one time. However, the quantity of inventory maintained by one engaged in the business of receiving and selling stolen property will obviously depend upon the nature and value of the property being received and sold.

Before leaving this enhancement, we note that, in addition to adopting note 5, Amendment 617 to the Guidelines substantially modified § 2B1.1, the theft guideline. Previously, the base offense level was 4 and the "in the business" enhancement added

4 levels. Now, the base offense level is 6 and the enhancement adds 2 levels. In other words, the significance of the enhancement was substantially reduced. Before Booker, the Supreme Court explained that a Guidelines error required a remand "only if the sentence was 'imposed *as a result of* an incorrect application' of the Guidelines." Williams v. United States, 503 U.S. 193, 202-03 (1992) (quoting 18 U.S.C. § 3742(f)(1); emphasis in original). After Booker, a district court may vary from the advisory guidelines range, and we review the determination of that range for *significant* procedural error under Gall, 128 S. Ct. at 597. In this regime, a harmless error in resolving a fact-intensive guidelines issue does not require a remand. See United States v. Henderson, 416 F.3d 686, 694-95 (8th Cir. 2005), cert. denied, 546 U.S. 1175 (2006); Mashek, 406 F.3d at 1017. Therefore, we encourage a district court in resolving an issue of this nature to state whether its resolution of the issue affected its ultimate determination of a reasonable sentence. Cf. Booker, 543 U.S. at 306-09 & n.6 (Scalia, J., dissenting in part).

2. Vickers next argues that the district court clearly erred in imposing a two-level enhancement for obstruction of justice. See U.S.S.G. § 3C1.1. The court based the enhancement on its findings that Vickers committed perjury when he testified at trial and intimidated witnesses to change their stories during the investigation. Either finding would support the enhancement.

A defendant is subject to this enhancement "if he testifies falsely under oath in regard to a material matter and does so willfully rather than out of confusion or mistake." United States v. Garcia-Gonon, 433 F.3d 587, 592 (8th Cir. 2006). In finding that Vickers committed perjury at trial, the district court explained:

> [D]efendants sometimes have a problem with the truth during their testimony, and . . . some of that coloring of testimony can be attributed to their point of view. I can't say that for Mr. Vickers. It seems to me Mr. Vickers just out and out lied on the witness stand.

"We have repeatedly affirmed obstruction-of-justice enhancements, despite the absence of specific findings on the elements of perjury, when the evidence of the defendant's willfulness was unequivocal and the record left no doubt that the defendant's false testimony at trial was not the result of confusion, mistake, or faulty memory." United States v. Brown, 311 F.3d 886, 890 (8th Cir. 2002) (quotations omitted). Although Vickers argues the court gave too much credence to the jury's unreasonable verdict, we conclude its finding was not clearly erroneous. Moreover, there was substantial evidence -- the testimony of Henson, Bailiff, and Bryant -- supporting the court's additional finding that Vickers attempted to induce witnesses to change their stories through threats and offers of payment. See United States v. Carrillo, 380 F.3d 411, 414 (8th Cir. 2004). For both reasons, the court's finding that Vickers obstructed justice was not clearly erroneous.

The judgment of the district court is affirmed.

SHEPHERD, Circuit Judge, concurring.

Though I agree with the balance of the majority's opinion, I write separately to offer a plausible alternative view to the majority's suggestion that a district court may render harmless an incorrect Guidelines range by stating that "its resolution of the issue" that caused the miscalculation did not "affect[] its ultimate determination of a reasonable sentence," ante at 7, an important issue not briefed or argued to the panel and unnecessary to the resolution of this appeal.

Gall v. United States, 128 S. Ct. 586 (2007) calls for an appellate court to conduct two layers of review, first for procedural soundness, and then for substantive reasonableness. Id. at 597. To determine whether a sentence is procedurally sound, appellate courts must, among other things, "ensure" that the district court properly calculated the Guidelines range because the failure to do so is a "significant procedural error." Id. However, the Supreme Court did not provide us with one key piece of the sentencing review puzzle: what to do with a significant procedural error?

-8-

The majority takes the position that there are two kinds of significant procedural errors–harmless errors that do not require resentencing and nonharmless errors that call for resentencing. But see United States v. Langford, 516 F.3d 205, 218 (3d Cir. 2008) ("The dissent urges that we resolve the issue before us by looking to see if the correct range seems close enough to the actual sentence imposed. If so, the argument goes, the sentence is 'reasonable.' However, this ignores the fact that the failure to start with the correct Guideline range is legal error that thwarts reasonableness review–that is, it cuts off our review process before we even reach the issue of reasonableness."). Another view is that any sentence premised on any significant procedural error must be vacated and remanded for resentencing. The majority's contrary position, that, despite a sentence's procedural unsoundness, we can proceed to review its substantive reasonableness may improperly blur the distinct levels of review mandated by Gall. See United States v. Allen, 516 F.3d 364, 372 (6th Cir. 2008) ("[W]e find the sentencing decision procedurally unreasonable, and therefore, we do not reach the question of substantive reasonableness . . . ." (internal citation omitted) (citing Gall, 128 S. Ct. at 597; Rita, 127 S. Ct. at 2462); Langford, 516 F.3d at 218 (same); see also United States v. Pepper, 518 F.3d 949, 951 (8th Cir. 2008) ("Before reaching the substantive reasonableness of the sentence, we 'must first ensure that the district court committed no significant procedural error . . . .'" (quoting Gall, 128 S. Ct. at 597)). These cases suggest that, under Gall, once an appellate court finds a sentence to be procedurally unsound, it cannot proceed to review the sentence's substantive reasonableness. The majority's contrary submission that a district court can somehow unring the "significant procedural error" bell arguably undercuts the rigorous procedural review Gall demands of appellate courts. 128 S. Ct. at 597.

In summary, I am reluctant to suggest with certainty that an incorrect Guidelines range does not require remand, even if the district court states that such error did not affect its imposition of the sentence. I write only to offer a tenable interpretation of Gall's mandate to appellate courts in the event of significant

procedural error that differs from that proffered by the majority. With this reservation, I join the majority's opinion and concur in its judgment.

_____